**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

KARLA HAMNER :
:
:
v. : Civil No. CCB-10-2485
:
:
ANNE ARUNDEL COUNTY, et al. :
:
:
:

**MEMORANDUM**

Now pending before the court is a motion for summary judgment filed by John R. Leopold ("Mr. Leopold") and Anne Arundel County, Maryland (together, the "defendants") in this suit brought by plaintiff Karla Hamner ("Ms. Hamner"). Ms. Hamner alleges hostile work environment (Count I) and retaliation (Count II) under Title VII of the Civil Rights Act of 1964 ("Title VII"). She also alleges that the defendants deprived her of her First Amendment free speech rights in violation of 42 U.S.C. § 1983 (Count III). For the reasons stated below, the defendants' motion will be denied as to Counts I and II and granted as to Count III.

**BACKGROUND**

In August 2007, Karla Robinson Hamner was hired as a full-time employee in the Anne Arundel County Executive's office. She worked as Special Assistant to the Chief Administrative Officer, Dennis Callahan. During Ms. Hamner's tenure in the county executive's office, the support staff for the office consisted entirely of female employees. These employees worked for County Executive John Leopold ("Mr. Leopold"), Dennis Callahan ("Mr. Callahan"), and Erik Robey ("Mr. Robey").

Ms. Hamner alleges that Mr. Leopold, Mr. Callahan, and Mr. Robey treated women in a "demanding, intimidating, and oftentimes demeaning fashion." (*See* ECF No. 22-1, Harris Aff., ¶ 6.) Mr. Leopold and Mr. Callahan routinely spoke in a loud voice only inches away from female employees' faces to emphasize their displeasure. Both men rarely opened doors for themselves and instead waited for women walking behind them to open doors for them. Ms. Hamner claims that Leopold often spoke to employees about various women's appearance or attractiveness. According to Ms. Hamner, shortly after she was hired, Mr. Leopold was watching a group of people on the street and asked Ms. Hamner if she "knew the woman with the blond hair in the green dress with big boobs."

Ms. Hamner alleges that Mr. Leopold talked loudly and openly about certain female employees, describing them in degrading and derogatory terms to other employees. (*See* ECF No. 22-2, Harris Aff., ¶ 14.) Mr. Leopold also commented frequently on the attire of female employees but never on that of male employees. He regularly reassigned women to other county offices when he was displeased with them for any reason, and would lose his temper with female employees "over trivial matters," including their appearance. After fall 2007, Mr. Leopold excluded the female members of the executive staff from weekly strategy meetings, even though all staff participated in those meetings previously.

In late 2007, while Ms. Hamner was taking notes during a meeting in Mr. Leopold's office, Mr. Leopold told her "to get the hair out of her eyes." A few weeks later, during a phone call with Ms. Hamner about media inquiries, Mr. Leopold asked Ms. Hamner if her hair was in her eyes while she was talking on the phone with him. Mr. Leopold's comments about Ms. Hamner's hair became frequent. In February 2008, a coworker informed Ms. Hamner that Mr.

Leopold had commented to the coworker, "Haven't I told Karla about her hair being in her face?" after Ms. Hamner had left Mr. Leopold's office.

In April 2008, after Ms. Hamner was designated as acting Public Information Officer ("PIO"), Mr. Leopold called Ms. Hamner into his office so that he could dictate a media response to her. Ms. Hamner looked down while taking notes, causing her hair to cross her brow. Mr. Leopold asked her "to get her hair out of her face." Ms. Hamner quickly complied by putting her hair behind her ear. According to Ms. Hamner, Mr. Leopold started dictating again but then stopped abruptly, turned toward Ms. Hamner, and grabbed her by both of her upper arms, twisting her around so that she faced him. Mr. Leopold yelled into her face, "I want you to turn and face me, like this. And get your hair out of your face!"

Later that day, Ms. Hamner told Mr. Robey about Mr. Leopold's discriminatory treatment and physical assault. (ECF No. 22-6, Robinson Aff., ¶ 5.) Mr. Robey asked Ms. Hamner if she wanted him to talk to Mr. Leopold, but she declined, citing fear of retaliation. (*Id.*)

Mr. Robey disputes Ms. Hamner's account of their conversation. According to Mr. Robey, Ms. Hamner complained to him that Mr. Leopold asked her to face him and remove the hair from her eyes, but she did not state that he grabbed her arms. (ECF No. 61, Robey Aff., Ex. 9, ¶ 3.) Mr. Robey asserts that Ms. Hamner did not refer to "any employment discrimination law, or any other law," nor did Ms. Hamner suggest that her concerns related to her gender. (*Id.*)

On or about May 19, 2008, another PIO was hired and Ms. Hamner's duties were immediately revoked. Mr. Robey instructed her to have no further contact with the media pursuant to a decision by the County Executive. On or about May 29, 2008, Ms. Hamner asked to speak with County Personnel Officer Andrea Fulton ("Ms. Fulton") in confidence. Ms. Hamner told Ms. Fulton about the incident in Mr. Leopold's office and stated that she was

fearful of continuing to work in the executive offices. Ms. Hamner indicated that she no longer wanted to work in the county executive's office because of Mr. Leopold's "continuing treatment of women," to which Ms. Fulton responded, "believe me, I know what you mean." (ECF No. 22-6, Robinson Aff., ¶ 3.) Ms. Hamner indicated her interest in transferring to another position in the county government to avoid Mr. Leopold's harassment. Ms. Hamner never made a formal request for a transfer, however, so as not to jeopardize her employment. (*Id.* at ¶ 7.) Ms. Fulton agreed to keep their conversation confidential. (*Id.*)

Like Mr. Robey, Ms. Fulton also disputes Ms. Hamner's description of their conversation. According to Ms. Fulton, on May 30, 2012, Ms. Hamner complained to her that Mr. Leopold asked her to face him and remove the hair from her eyes, but she did not tell Ms. Fulton that he grabbed her arms. (ECF No. 61, Fulton Aff., Ex. 8, ¶ 10.) Ms. Fulton asserts that Ms. Hamner did not refer to "any employment discrimination law, or any other law," nor did Ms. Hamner suggest that her concerns related to her gender or that she was seeking to lodge a formal complaint. (*Id.*) Ms. Fulton also claims that Ms. Hamner had informed her a few weeks earlier that she was interested in a newly created position as a PIO in the police department, and she reiterated her interest in transferring to a new position when they met on May 30th. (*Id.* at ¶ 8-9.)

Within hours of her conversation with Ms. Fulton, Ms. Hamner was notified that she would be transferred to the police department the following Monday and would assume a provisional placement as acting PIO. (ECF No. 22-7, Robinson Aff., ¶ 7.) Fulton assured Ms. Hamner that she could "almost guarantee" that Ms. Hamner would get the job. (*Id.*) But for this assurance, Ms. Hamner would not have agreed to the transfer. (*Id.*) Later that day, Mr. Robey directed Ms. Hamner to collect her belongings and informed her that she was not to work until her transfer to the police department. Mr. Robey also told Ms. Hamner that she should not have

gone outside of the Administration (to Ms. Fulton) to complain about Mr. Leopold's behavior or inquire about a transfer. (ECF No. 22-1, Harris Aff., ¶ 8.) Mr. Robey warned Ms. Hamner that she had not handled the situation appropriately, but he assured her that he had been able to calm Mr. Leopold down and smooth things over. Mr. Robey denies that he referred to Mr. Leopold's reaction during this conversation. (ECF No. 61, Robey Aff., Ex. 9, ¶ 5.)

After transferring to the police department, Ms. Hamner received no information regarding her duties nor a job title, description, or training. No one at the police department possessed information about her transfer or knew of her intention to remain in the position permanently. Upon discovering that everyone at the police department believed that she was "on loan" from the county executive's office and would return to that office once the PIO position was filled permanently, Ms. Hamner initiated a conversation with Captain Tom Wilson. When she informed him that she would like to remain in her position permanently, Captain Wilson suggested that she apply for other positions instead.

On August 6, 2008, Ms. Hamner interviewed for the PIO position with the police department. On or about September 2, 2008, Ms. Hamner was terminated. Lieutenant Eric Hodge informed her that she had not been chosen for the PIO position.

Ms. Hamner first filed a charge of discrimination with the EEOC on May 14, 2009.[1] She filed suit in Anne Arundel County Circuit Court on August 24, 2010, alleging gender discrimination, sexual harassment, and retaliation. The case was removed to this court on September 9, 2010. Ms. Hamner filed an amended complaint on September 30, 2010, against Anne Arundel County, Mr. Leopold, and Mr. Callahan, alleging hostile work environment and retaliation under Title VII, deprivation of her First Amendment free speech rights in violation of

---

[1] The EEOC issued a notice of right to sue on August 31, 2010.

42 U.S.C. § 1983, and common law wrongful or abusive discharge. In her amended complaint, Ms. Hamner claims that a police department supervisor was directed to manipulate Ms. Hamner's interview scores to prevent her from being hired for the PIO position, and that such manipulation constituted retaliation for her complaints about Mr. Leopold's conduct. Each of the four members of the hiring panel, however, disputes this allegation, asserting that he was never contacted by the County Executive or anyone in the County Executive's office or subjected to any external influence regarding the selection process. (*See* ECF No. 61, Ex. 2-5.)

On May 12, 2011, this court dismissed Ms. Hamner's Title VII claims against Mr. Leopold and Mr. Callahan individually, as well as her state law claims.[2] The court also ruled that Ms. Hamner's Title VII claims based on the alleged involuntary transfer on May 30, 2008, were time-barred, but those based on alleged retaliatory failure to hire in September 2008 were not. In addition, the court ruled that Ms. Hamner's hostile work environment claim would not be time-barred under a continuing violation theory only if the September 2008 failure to hire qualifies as an act "contributing to the claim" for which defendants are responsible. Finally, the court ruled that Ms. Hamner's § 1983 claims for the alleged involuntary transfer in May 2008 and failure to hire in September 2008 in retaliation for her exercise of her First Amendment rights were not time-barred.

On June 20, 2012, the defendants filed a motion for summary judgment as to all remaining counts: the Title VII hostile work environment and retaliation claims and the claim alleging a violation of 42 U.S.C. § 1983. The defendants subsequently filed a motion for a stay of discovery or for a protective order in response to Ms. Hamner's efforts to schedule depositions of Mr. Leopold and Deputy Chief Emerson Davis of the county police department. On August 6, 2012, the court ruled that the depositions of four county police officers could proceed so long as

[2] Mr. Callahan passed away on February 8, 2012, and is no longer a party in this suit.

they were limited to personal knowledge concerning the police department's failure to hire Ms. Hamner. The court ordered all other discovery stayed until the defendants' motion to dismiss in *Harris v. Leopold* (Civil No. CCB-12-0829) was resolved, and ordered that Mr. Leopold not be deposed in light of his pending criminal trial.

Shortly thereafter, Ms. Hamner presented deposition evidence from three police department employees indicating that the defendants directed members of the hiring panel to manipulate Ms. Hamner's interview scores so she would not be chosen for the PIO position. Officer Joseph Pazulski testified that Mr. Leopold told him to tell Chief Teare that Ms. Hamner would be coming to the police department, but that when it came time for her to interview for the PIO position, she was not to get the job. (ECF No. 72-4, Pazulski Dep., p. 67.) Soon after Ms. Hamner filed her EEOC complaint, she informed Officer Pazulski that her attorney had received an anonymous call indicating that someone possessed information relevant to her case and was willing to be deposed. (ECF No. 72-5, Pazulski Dep., p. 92-93.) Officer Pazulski reported this to Chief Teare, who then called County Attorney Jonathon Hodgson and instructed Officer Pazulski to speak with Mr. Hodgson regarding what Ms. Hamner had told him. (*Id.* at p. 95-96.)

Major Edward Bergin's and Lieutenant Thomas Kohlmann's testimony corroborates that of Officer Pazulski. Major Bergin testified that Chief Teare told Major Bergin that Mr. Leopold wanted Chief Teare to "take Karla Hamner over here to the police department and get rid of her," and that Ms. Hamner was "not to be a County employee." (ECF No. 72-3, Bergin Dep., p. 29-30.) According to Lieutenant Kohlmann, Lieutenant Hodge spoke with Lieutenant Kohlmann immediately after meeting with Chief Teare and informed Lieutenant Kohlmann that Mr. Leopold "had a problem with a woman down at the Arundel Center" and she would be transferred to the police department. (ECF No. 72-1, Kohlmann Dep., p. 8.) Lieutenant Hodge

told Lieutenant Kohlmann the police department planned to conduct interviews for a position there, but the woman was not going to be hired. (*Id.*) Based on the deposition testimony of Pazulski, Bergin, and Kohlmann, Ms. Hamner filed a motion to compel testimony, disqualify counsel, and remove the stay and enlarge the scope of discovery. The defendants subsequently filed a motion to strike an affidavit by county executive office employee Carla Sagerholm that Ms. Hamner had attached to her reply to the defendants' opposition to the motion to compel. Finally, Mr. Leopold's new counsel filed a motion to supplement in order to bring to the court's attention a case decided after the court's earlier memorandum that supports Mr. Leopold's claim for qualified immunity.

## ANALYSIS

### Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

**Discussion**

Title VII Claims

*Retaliation*

The defendants challenge both Ms. Hamner's retaliation and her hostile work environment claims under Title VII based on their view that Ms. Hamner offered insufficient evidence that the defendants interfered in the PIO hiring process. To establish a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) the protected activity and the adverse action were causally connected. *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 656 (4th Cir. 1998). If she does so, the burden shifts to the defendant to proffer a legitimate, nonretaliatory reason for its decision, which she must then rebut. *Id.*

There is no dispute that Ms. Hamner engaged in protected activity when she complained of harassment to Mr. Robey and Ms. Fulton, or that the police department's failure to hire her constitutes an adverse employment action. To survive summary judgment, then, Ms. Hamner must have evidence from which a reasonable factfinder could conclude that a causal connection exists between the protected activity and the adverse action. *Id.* at 657.

To prove that the failure to hire was causally connected to her complaints, Ms. Hamner must demonstrate that the defendants failed to hire her *because of* her complaints. *Id.* The depositions of Officer Pazulski, Major Bergin, and Lieutenant Kohlmann raise a genuine issue of material fact as to whether individuals in the police department manipulated Ms. Hamner's interview score in retaliation for her complaints of gender discrimination. Officer Pazulski testified that Mr. Leopold asked him to tell Chief Teare that when it came time for Ms. Hamner to interview for the PIO position, she was not to get the job. (ECF No. 72-4, Pazulski Dep., p. 67.) Major Bergin testified that Chief Teare told Major Bergin that Mr. Leopold wanted Teare to "take Karla Hamner over here to the police department and get rid of her," and that Ms. Hamner was "not to be a County employee." (ECF No. 72-3, Bergin Dep., p. 30.) Finally, Lieutenant Kohlmann testified that Lieutenant Hodge told Lieutenant Kohlmann that Mr. Leopold "had a problem with a woman down at the Arundel Center" and she was getting moved to the police department. (ECF No. 72-1, Kohlmann Dep., p. 8.) Lieutenant Hodge stated that they were going to conduct interviews for a position in the department, but the woman was not going to get the job. (*Id.*)

This evidence casts serious doubt on the defendants' "legitimate, nonretaliatory justification" for the failure to hire Ms. Hamner, namely that another candidate was better qualified for the position. Because a genuine dispute of material fact exists regarding whether Ms. Hamner was passed over for the PIO position because of her complaints of harassment, her retaliation claim may proceed.

*Hostile Work Environment*

This court ruled previously that Ms. Hamner's hostile work environment claim will not be time-barred under a continuing violation theory only if the failure to hire her qualifies as an

act "contributing to the claim" for which defendants are responsible. *See Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). As a consequence, Ms. Hamner's hostile work environment claim is dependent on her claim for retaliatory failure to hire. Because Ms. Hamner has raised a genuine issue of material fact as to her retaliation claim, the court also declines to grant summary judgment as to her hostile work environment claim.

Section 1983 Claim

Ms. Hamner also alleges that the defendants unlawfully transferred and failed to hire her for exercising her First Amendment free speech rights. The Fourth Circuit has adopted a three-part test to determine whether a public employee has stated a First Amendment claim for retaliation. *Brooks v. Arthur*, 685 F.3d 367, 371 (4th Cir. 2012) (citing *Daniels v. Quinn*, 801 F.2d 687 (4th Cir. 1986); *McVey v. Stacy*, 157 F.3d 271 (4th Cir. 1998)). First, the court must consider "whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest." *Id.* (quoting *McVey*, 157 F.3d at 277). Second, the court must determine "whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in managing the working environment." *Id.* (internal quotation marks and citation omitted). Third, the court "turns to the factual question of whether the employee's speech was a substantial factor" in the decision to take the allegedly retaliatory action. *Id.*

"The first prong of the *McVey* test, whether the speech addressed a matter of public concern, is 'the threshold question.'" *Id.* at 371 (quoting *Rankin v. McPherson*, 483 U.S. 378, 384 (1987)). "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir. 2000). Matters related to an employee's self-interest, such as personal grievances or complaints

about employment conditions, are not matters of public concern protected by the First Amendment. *Stroman v. Colleton County Sch. Dist.*, 981 F.2d 152, 156 (4th Cir. 1992) (citing *Connick v. Myers*, 461 U.S. 138, 147 (1983)). Courts should consider the "content, form, and context of a given statement" when evaluating whether an employee's speech addresses a matter of public concern. *Connick*, 461 U.S. at 147-48. Courts should scrutinize an employee's comments "to assess whether they are intended 'to evaluate the performance of the office' — which would merit constitutional protection—or merely 'to gather ammunition for another round of controversy' with superiors—which would not." *Brooks*, 685 F.3d at 371 (quoting *Connick*, 461 U.S. at 148).

In *Brooks v. Arthur*, the Fourth Circuit rejected a § 1983 action brought by corrections officers who alleged that their supervisors retaliated against them for exercising their First Amendment rights. 685 F.3d at 370. The employees were fired shortly after they lodged an employment complaint via an internal grievance procedure. *Id.* at 369-70. They claimed in the complaint that their supervisors had discriminated against them by giving them less desirable assignments, mishandling their complaints against an inmate, and performing unwarranted security checks during their shifts, among other things. *Id.* The court concluded that the plaintiffs' speech "pertained to personal grievances and complaints about conditions of employment rather than broad matters of policy meriting the protection of the First Amendment." *Id.* at 372. Noting that the plaintiffs, by using the internal grievance procedure, did not "seek to communicate to the public or to advance a political or social point beyond the employment context," *id.* at 373 (quoting *Borough of Duryea v. Guarnieri*, -- U.S. --, 131 S. Ct. 2488, 2501 (2011)), the court held that the complaint did not qualify as a matter of public concern.

In contrast, in *Campbell v. Galloway*, 483 F.3d 258, 270 (4th Cir. 2007), the Fourth Circuit concluded that a police officer's complaints of sexual harassment *did* touch on matters of public concern. Campbell, one of only a few female officers in the Southern Pines, North Carolina, police department, had submitted a 13-page memo to the chief of police setting out her complaints. Although the memo focused on "perceived slights," it mentioned multiple instances of inappropriate conduct directed toward her and other female officers as well as members of the public. *Id.* at 263, 269-70. According to the court, Campbell was seeking to challenge sexual harassment within the police department as much as she was seeking a resolution of her own complaint. *Id.* at 270. Thus, after considering the content, form, and context of Campbell's complaints in the light most favorable to her, the court concluded that her complaints raised issues that would be of genuine concern to the public. *See also Cromer v. Brown*, 88 F.3d 1315, 1325-26 (4th Cir. 1996) (black officers' association letter addressing department-wide procedures involved a matter of public concern).

Like the plaintiffs' complaint in *Brooks*, Ms. Hamner's complaints to Mr. Robey and Ms. Fulton focused primarily on the mistreatment she experienced rather than on "broad matters of policy." *Brooks*, 685 F.3d at 372. Although, during her conversation with Ms. Fulton, Ms. Hamner made a vague reference to Mr. Leopold's "continuing treatment of women" (ECF No. 22-6, Robinson Aff., ¶ 3), she did not refer to any specific conduct directed toward any identifiable woman, nor did she elaborate on what the "treatment" involved. Indeed, it is not alleged that Ms. Hamner was seeking to challenge gender discrimination in the executive office on behalf of other employees. Rather, she sought only a resolution of her own complaint through a transfer to a different office. As in *Brooks*, Ms. Hamner declined to "seek anything other than an improvement of [her] own situation." 685 F.3d at 374.

The court continues to believe that sexual harassment of employees by a high-ranking political official may well be a matter of public concern, as recognized by *Campbell*. In light of *Brooks*, however, and an analysis of the context in which Ms. Hamner communicated her grievance, it appears that, at a minimum, Mr. Leopold is entitled to the defense of qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (government officials are shielded from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"). Moreover, because Ms. Hamner does not claim that the execution of an official policy or custom of Anne Arundel County caused the alleged violation of her First Amendment rights, the county cannot be held liable under § 1983.[3] *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004).

Motion to Compel

On August 9, 2012, Ms. Hamner filed a motion to compel testimony, disqualify counsel, and enlarge the scope and remove the stay of discovery. Ms. Hamner filed this motion in light of information obtained from the depositions of Officer Pazulski, Lieutenant Kohlmann, and Major Bergin. Ms. Hamner moved to compel the testimony of Officer Pazulski as to his conversation with Attorney Hodgson, claiming that the conversation was not privileged. Ms. Hamner also moved to disqualify Mr. Hodgson as counsel, arguing that he is a witness in the case because he was informed of the alleged unlawful acts that are the subject of the suit. Finally, Ms. Hamner moved for a removal of the stay of discovery or an enlargement of its scope based on testimony from Major Bergin and Lieutenant Kohlmann demonstrating that Lieutenant Hodge knew of the plan not to hire Ms. Hamner for the PIO position.

[3] Even if Ms. Hamner contended that Mr. Leopold's action as County Executive amounted to official policy, she would not state a First Amendment claim in light of *Brooks* and the fact that she sought only an internal resolution of her personal complaint.

In response, the defendants argued that neither the stay issue nor the other matters that relate to stayed discovery were ripe for decision under the court's prior ruling, and that completion of the four depositions does not relate to the stay issue. The defendants claim that Ms. Hamner was hired for the legitimate business reason of selecting the best candidate, and that none of the information in the depositions contradicts Lieutenant Hodge's or the other panelists' ratings.  Finally, the defendants challenged Ms. Hamner's motion to compel testimony from Officer Pazulski regarding his conversation with Mr. Hodgson because it occurred after Ms. Hamner's employment with the county had ended.  The defendants argued both that the privilege issue is not ripe and that the communication between Officer Pazulski and Mr. Hodgson nonetheless appears to have been privileged.

Given the completion of Mr. Leopold's criminal trial, and that the court is today ruling on the motion to dismiss in the case brought by Joan Harris (Civil No. CCB-12-0829), the motion to lift stay will be granted. The motion to disqualify counsel is moot now that Mr. Leopold has private counsel to represent him. The motion to compel will be denied without prejudice at this time, because it does not appear likely that the conversation is relevant to the issues of the police department's failure to hire Ms. Hamner.

Motion to Strike

On September 12, 2010, the defendants filed a motion to strike the affidavit of Carla Sagerholm. Citing Federal Rule of Civil Procedure 12(f), the defendants claim that Ms. Sagerholm's affidavit is immaterial, impertinent, and scandalous. Ms. Hamner had attached Ms. Sagerholm's affidavit to her reply to the defendants' opposition to Ms. Hamner's motion to compel. Although the affidavit contains paragraphs relevant to the Harris case (Civil No. CCB-

12-0829), it includes no information relevant to Ms. Hamner's suit. As a result, the motion to strike will be granted.

A separate Order follows.

3/18/13
Date

/s/
Catherine C. Blake
United States District Judge